IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| RASHAD C. LEE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 22-0050-KD-MU |
| | ) | |
| CYNTHIA STEWART, | ) | |
| WARDEN REOSHA BUTLER, | ) | |
| WARDEN ANTONIO MCCLAIN, | ) | |
| CAPTAIN JOHNNY McNEAL, and | ) | |
| LT. BRUCE FINCH, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Plaintiff Rashad C. Lee, an Alabama prison inmate proceeding *pro se*, filed an action under 42 U.S.C. § 1983. This action is now before the Court on the motion for summary judgment filed by Defendants Regional Director Cynthia Stewart, Warden Reosha Butler, Warden Antonio McClain, Captain Johnny McNeal, and Lt. Bruce Finch (docs. 108-110), and Plaintiff Lee's response in opposition (doc. 121).[1] Upon consideration, and for the reasons set forth herein, Defendants' motion for summary judgment is **GRANTED**, **in part,** and **DENIED, in part**.

I. Procedural history

Lee filed his initial complaint against McClain and McNeal on January 30, 2022 (doc. 1, docketed February 2, 2022). Lee amended his complaint (docs. 2, 3). He also moved for a preliminary injunction (doc. 5). His motion was denied (doc. 33). McClain and McNeal filed

---

[1] Lee's motion to seal the dorm incident report (doc. 122) is GRANTED.

their answer and special report which were converted to a motion for summary judgment (doc. 49).  Limited discovery followed (docs. 50, 51, 63).

In August 2023, summary judgment was entered in favor of McClain and McNeal as to Lee's First Amendment retaliation claim (doc. 67). The Court denied their motion as to Lee's Eighth Amendment deliberate indifference claim. (Id.). Counsel appeared on behalf of Lee and filed a Second Amended Complaint, and then a Third Amended Complaint, (doc. 90) which is now the operative complaint.

In Count I of the Third Amended Complaint, Lee alleges that McClain and McNeal violated his Eight Amendment rights because they failed to protect him from assailants in the Gangsta Disciple dormitory which resulted in the January 27, 2022 attack on Lee (Count I).  Lee alleges that McClain and McNeal were on notice that Lee feared for his life and were deliberately indifferent to the substantial risk of harm that Lee faced from these assailants (doc. 90, p. 13).

In Count II, alleging "First Amendment Retaliation", Lee alleges that McClain violated his rights under the First Amendment because he retaliated against Lee. Specifically, "by denying him an emergency transfer to another facility in February 2022 after McClain was placed on notice in early to mid-February that Lee "faced a serious risk of harm while he remained inside the protective unit" where he was placed after the January 27, 2022 attack (doc. 90, p. 14).

Lee alleges that McClain, McNeal, and Finch violated his rights under the First Amendment because they wrote him up, or "caus[ed] him to be written up, for a bogus disciplinary charge on January 25, 2022 (doc. 90, p. 14).  Lee alleges that they were aware that day, that "Lee would file a grievance, complaint, or legal action against them for transferring him

to general population" and "sought to retaliate against" Lee (doc. 90, p. 15).  Lee alleges that Finch wrote the disciplinary charge, which was later dismissed, at the "at the behest of" McClain or McNeal, or on his own, in retaliation for Lee's threat to file a lawsuit against McClain and McNeal (Id.).

Lee alleges that Butler retaliated against him, in violation of the First Amendment, "for filing lawsuits against Fountain correctional officers by keeping … Lee placed in protective custody without reviewing his placement there by a segregation board and or transferring him to a different facility for his own protection." (doc. 90, p. 15).

Lee alleges that Stewart retaliated against him in violation of the First Amendment, because he filed this lawsuit against Fountain correctional officers. Specifically, Lee alleges that Stewart ordered "his custody level to be changed from minimum-security to medium-security without first finding him liable for a disciplinary violation and providing him with a reclassification hearing." (doc. 90, p. 15).[2]

In Count III, Lee alleges that Stewart "intentionally inflicted emotional distress" on Lee when she "raised his custody level status, prevented him from being placed in a work-release camp and instead placed him in a medium security facility" (doc. 90, p. 16).  Lee alleges that in this facility he "daily observes fights and regularly observes bloody assaults, witnessed at least two murders, constant drug overdoses" and is exposed to fire and smoke hazards" (Id).

Defendants, sued in their individual capacity, move the Court for summary judgment (doc. 109).  They argue that they are protected from suit under the qualified immunity doctrine because "Lee has failed to allege any facts supported by material evidence that would establish" that Defendants violated Lee's constitutional rights under the Eighth. They also argue that Lee

---

[2] Lee clarified that this claim is only against Stewart (doc. 121, p. 21, n. 9).

failed to allege any plausible claim for retaliation under the First Amendment.  They also argue

that Lee's claim for intentional infliction of emotional distress should be dismissed because he

"cannot prove that any of the Defendants could have him transferred" (doc. 109).

II. <u>Factual Background</u>[3]

A.  <u>The October 2016 attack</u>

Plaintiff Rashad Lee has been in the custody of the Alabama Department of Corrections

(ADOC) for over 20 years, during which time he has been housed at multiple prisons in

Alabama. This lawsuit stems from his confinement at Fountain Correctional Facility

("Fountain") in 2021-2022, but is rooted in his 2016 confinement at Fountain when he was

attacked and injured by six inmates, two of whom were identified and validated as enemies

(doc. 110-1, August 9, 2019, Deposition of Rashad Lee, p.  28).  Lee claims that the assailants

were associates of a man known to Lee as Pooh Man, with whom Lee had an altercation while

housed at Elmore Correctional Facility (doc. 110-1, p. 28).   After the attack at Fountain, Lee was

transferred to another correctional facility (doc. 110-3, Inmate Movement History). Lee sued

Fountain correctional officials for failing to protect him from the attack by the validated enemies.

<u>Lee v. Peterson, et al</u>., Civil Action No. 16-00625-CG-B (S.D. Ala. 2016).

B. <u>The January 25, 2022 transfer and the January 27, 2022 attack</u>

Lee was transferred back to Fountain on March 23, 2021 (Id.). Lee testified that the first

night in general population, he encountered a man in his dorm known as Red, whom Lee

recognized as an affiliate of the inmates involved in the 2016 attack. (doc. 110-2, pp. 13-16; doc.

121-1, Lee declaration). Lee testified that he and Red "sat up the whole night watching each

other" (doc. 110-2, p. 13). The next morning, Lee told Officer Walker, the dorm officer, about

---

[3] The "facts, as accepted at the summary judgment stage of the proceedings, may not be the
actual facts of the case." <u>Priester v. City of Riveria Beach,</u> 208 F.3d 919, 925 n.3 (11th Cir.
2000).

the "potential enemy" and Lee was transferred to a Restricted Housing Unit (RHU) (L Dorm) for

one night and then to the M-Dorm in the Fountain Annex, a minimum-security facility (Id.; doc.

121-1).  On April 10, 2021, Lee submitted an inmate grievance request to "Deputy Warden"

stating:

> Warden McClain I 'Cannot' under 'NO' Circumstances be placed in general
> population if returned back to FCC from the Annex because there are still guys
> over there that are associated with Bobby White and Pritchett that stabbed me last
> time I was over there and they've been sending threats to me by the guys in trade
> school saying I owe them for their homeboy but I didn't owe White shit and I
> don't' know or owe these guys. I fear for life please don't put me back over there
> just transfer me up North plz!.

(Doc. 63, p. 17, doc. 121-1, p. 1-2).  The grievance is stamped received on April 13, 2021 (doc.

63, p. 17).

On April 11, 2021, he submitted a second inmate grievance to the "Deputy Warden" and

the "Captain", stating that

> Warden McClain I Recently wrote you about the threats I've been getting from
> guys over there and you know I be coming over there for medical & to see mental
> health and the other day I was over there and told a guy told me I had a $1,000.00
> on my head and when I come back over there I'm a dead man. I fear for my Life!

(Doc. 63, doc. 121-1, p. 1-2). The grievance is stamped "received April 15, 2021" (Id., p. 18).

Inmate Allen Hendricks stated that at some time in April or May 2021, he overheard Lee

tell McClain that he could not return to the main facility because of the danger of another attack

(doc. 63, p. 15). He saw McClain "put something in his phone" and heard him tell Lee that he

"looked into that after getting your request slip and [ ] saw that, and that you won't go down the

hall if you come back over there" (Id.). Inmate Jerome Campbell stated that at some time in late

April 2021, he heard Lee tell McClain that he did not want to go to the main facility because of

the earlier attack, and that "a lot of the guys were probably still there in the facility because he

had been getting threats from the guys through trade school from the guys that was still over

there from the stabbing" (Id., p. 13).  He also heard Lee ask to be transferred because of these threats (Id.). Campbell heard McClain tell Lee he would "make sure that Lee was not put in general population" if he was moved to the main facility (Id.). Campbell also saw McClain "type something into his phone" (Id., p. 14).

 In June 2021, Lee again told McClain that he was in danger and should be transferred to another facility. He also told McClain about the incident on March 23, 2021, when he was placed in a cell with Red (doc. 121-1, p. 2).  Lee also told McClain that he "was receiving threats through trade school from some of the inmates over there, but they[4] didn't take me serious" (doc. 110-2, p. 38).

On January 25, 2022, Lee was still housed at M-Dorm in the Annex.  Around 5:50 p.m., Sgt. Finch, Shift Commander, informed Lee that he was on transfer to a facility in Loxley, Alabama.  Lee states that "Sgt. Finch told me to pack things and that I was being transported to a different facility, Lockley.[5]  I had a verbal altercation with Sgt. Finch and said I did not want to be transported there because it was further from my mother and other family." (doc. 121-1, ¶19). Lee's son had recently died in an automobile accident (doc. 121-1, ¶ 20).  Lee "expressed [his] frustration with Sgt. Finch" but "never said [he] would attempt to escape" (doc. 121-1, ¶ 22).[6] Lee also states that Sgt. Finch was "mad" at Lee because he "caught him selling phones back to prisoners" (doc. 121-1, ¶ 21).

Around 6:00 p.m., the following Incident Report was generated:

---

[4] In context, "they" appears to mean prison officials.

[5] The Alabama Department of Corrections has a minimum-security facility in Loxley, Alabama.

[6] Lee states that if he made a "valid escape attempt, Fountain correctional officers would have placed me in Restrictive Housing immediately … instead of in general population" (doc. 121, ¶ 24).

"On January 25, 2022, Sgt. Bruce Finch was assigned as shift commander at Fountain Correctional Facility M-Dorm. At approximately 5:50 p.m., Sgt. Finch notified inmate Lee, Rashad B/213823 (M-10-A) (unknown affiliation) that Lee was on transfer and that he needed to collect all of his property. Lee stated to Sgt. Finch that if inmate Lee was transferred he was going to escape. At approximately 6:00 p.m. Sgt. Finch notified Warden II Antonio McClain of the incident. At approximately 7:00 p.m. Lt. Dexter Wright and Sgt. Finch transported inmate Lee to Fountain Correctional Facility. No Further Information at this time. 1/25/2022 8:34 PM by bruce.finch"

(Doc. 110-4).

At approximately 8:18 p.m., Lee was moved from M-Dorm in the Annex to the main facility (doc. 110-3). Lee's alleged statement regarding escape resulted in his transfer from the Annex to I-Dorm in the main facility, instead of to Loxley.

Upon arrival at the main facility, a health unit nurse examined Lee's body and made notes on an Inmate Body Chart Documentation Form (doc. 62, p. 95). His "inmate statement" to the nurse: "I fear for my life. I don't want to go to general population" was documented (doc. 62, p. 95).

Lee also talked with McNeal at the health unit. According to McNeal, Lee heard a rumor that he would be transferred to Loxley, that Lee didn't want to go there, and Lee told Finch that if he were "transferred there, that he was going to escape" (doc. 110-5). McNeal stated that Lee told him "he had enemies down the hallway due to a recent incident that occurred a long time ago." (doc. 110-5) McNeal replied to Lee that Lee had "no validated enemies in the main facility and from the last incident that occurred in the main facility all his enemies was validated and transferred" (doc. 110-5).

Lee states that he begged McNeal "not to send [him] to general population" because he "had been stabbed and robbed the last time there" (doc. 121-1, ¶ 27), but "Captain McNeal just laughed and told [Lee] 'to get his shit and go to population.'" (doc. 121-1, ¶ 29). Lee also states

that he told McNeal, that even though he had no verified enemies at Fountain, he had seen inmates who were associated with his former assailants, such as Red, and had received threats from inmates in general population at the main facility by way of inmates from the Annex who went to trade school at the main facility (doc. 121-2, p. 6).[7]

Lee states that he sent a message to McClain to ask that he not be placed in general population and that McClain sent word through McNeal that "he had no talk for" Lee (doc. 121-1, ¶ 26).  Lee states that he told McNeal that if he "was assaulted in general population, [he] intended to sue both him and Warden McClain for violating [his] constitutional rights by failing to protect" him (doc. 121-1, ¶ 29).

Lee was reassigned to Dormitory I-54A in the main facility (doc. 110-5).  He testified that the I-Dorm was controlled by the Gangster Disciple gang (doc. 110-2, p. 55). Lee was not affiliated with a gang (doc. 121-1, p. 4).[8] According to Lee, his prior attackers were associated with or members of the Bloods, and they controlled a different dorm at the main facility (doc. 110-1, p. 18-39).  Lee testified that when he entered the I-Dorm, he was searched by two inmates and told to sleep in the TV room because he was not a Gangster Disciple (doc. 110-2, p. 32, 49. 55).  Lee slept on a bench in the TV room, but the third morning - January 27, 2022 – when Lee was in the bathroom he was hit in the back of the head (doc. 110-2, pp. 64-72). Lee fell to the floor, balled up, and covered his head. (Id.) Then two inmates kicked and stomped Lee and stated that he owed money to "their homeboy" from the last time Lee was in general population (Id.).

---

[7] See also, page 5.

[8] Lee asserts that in 2021 and 2022, Butler segregated inmates based on gang affiliation and four major gangs had control of their respective dorms.  He asserts that correctional officers would not go into the dorms to protect inmates and that general population "was extremely dangerous for any non-affiliated prisoner" (doc. 121-1, ¶¶ 74-89).

He did not know his attackers and cannot identify them (Id.). He did not know any inmates in I-Dorm, and no one in I-Dorm recognized or knew him (doc. 110-2, pp. 32, 49).

 An unknown inmate helped Lee after the attack. He regained orientation, got his shower items, and took a shower (doc. 110-2, pp. 74-90).  The next morning, during pill call, Lee went to the health care unit and reported the attack to the on-call nurse (doc. 110-2, p. 81, 91).  Lee told both the on-call nurse and a mental health nurse that he warned prison officials that an attack was going to happen and that he "wanted to be locked up today for [his] safety" (doc. 110-2, p. 91-92).

An Inmate Body Chart Documentation Form was completed on January 27, 2022, at around 1:14 p.m. The nurse indicated there were "no visible injuries" to Lee (doc. 62-1, p. 94). Lee was given a mental health referral for placement in protective custody (doc. 62-1, p. 234-235). The nurse also completed an RHU Pre-Placement Screening. The document indicates that Lee was asked "Have you been harmed or assaulted (physically or sexually)?" and "Has anyone threatened or tried to harm you?" "No" was circled for both (Doc. 62-1, p. 234). Lee states that he has not "seen that form before and that he does not recall being asked those questions" (doc. 121-1). Lee also states that other answers on the form are incorrect, including a "Yes" answer to the question "Is this your first time in restrictive housing ("seg")?" (Id.). He states that "someone else answered the questions" (Id.; doc. 62-1, p. 234).

Lee was served with the January 25th disciplinary violation on January 31, 2022 (doc. 121-1, ¶ 45).   McClain testified that the violation was conspiracy to commit a violation of the rules. Specifically, conspiring to escape (doc. 121-3). He also testified that the disciplinary violation was not upheld due to "procedural violations." (Id.).  McClain explained that either the ten-day period to hold a hearing had passed "or something was wrong with the disciplinary" but

he could not say without reading the document (doc. 121-3).  McClain rejected the charges on February 23, 2022.  Lee was served with the decision on March 13, 2022 (doc. 110-6, Disciplinary Reports).

      C. <u>Placement in the Restrictive Housing Unit</u>

Lee was placed in the RHU, alone in a single cell, on January 27, 2022 (doc. 62-1, p. 95-96).  On February 2, 2022, Lee's lawsuit alleging failure to protect was docketed (doc. 1).  Lee states that a "few days after" he filed the complaint, Butler called him "into her office" and referring to the complaint, told Lee that he "had 'gone about it the wrong way.'" (doc. 121-1, ¶ 51).  Lee states that Butler also told him that "'I'm where I am supposed to be' referring to a one-man cell, because 'maybe this will teach [Lee] to stop filing and writing against the ADOC administration everywhere I go if I sit back there in a one-man cell for a year'" (doc. 121-1, ¶ 52).  Lee told Butler that he continued to fear for his safety in general population and should be "transferred to a minimum-security work release camp where [he] could be housed without fear for [his] safety and without needing to spend twenty-three hours a day in a single cell." (doc. 121-1. ¶ 53).

On February 15, 2022, Lee submitted a sick call request for extreme pain in his back and wrote that "I was assaulted on 1/27 here and stomped and kicked in my back on the floor. I need pains and another brace" (doc. 62-1, p. 91; doc. 121-1). He wrote a similar sick call request on March 2, 2022 "I was attacked and stomped and kicked in my back repeatedly by gang bangers." (*sic*) (doc. 121-1, doc. 62-1, p. 90).

While in the RHU, Lee "continued to advocate for [his] rights.  He "wrote several grievances and complaints, arguing that [his] placement in protective custody was not regulated

by the Fire Marshall" and that the "area often filled with smoke from prisoners lighting fires" and he has asthma (doc. 121-1, ¶ 55-56).

On February 16, 2022, Lee complained that $125.00 was spent from his "inmate commissary account by a runner using [his] card at the canteen." (doc. 121-1, ¶ 57).[9]  The next day, the runner told the inmates in the RHU that McClain "had ordered all prisoners there not to purchase food from the canteen and that [Lee] was the reason prisoners could not buy items from the commissary" (doc. 121-1, ¶ 57-60).  Lee alleges that the inmates blamed Lee and threatened him with assault (Id.).

Lee also states that on March 10, 2022, when other prisoners were transferred from the RHU, Lee asked why he was not transferred.  Lee alleges that McClain told him, "If I keep you back here, you can't litigate your suit you alleged you've filed against me and in a year you will have learned your lesson and by then the courts will dismiss and the FCC administration will be 1-1" (doc. 121-1, ¶ 61).[10] On March 15, 2022, he was moved to Kilby Correctional Facility (doc. 110-3).

D. Increase in Lee's security level classification

Before March 15, 2022, Lee was classified as a minimum-security inmate and eligible for housing at minimum-security work release camps.  Lee states that Stewart, who knew him personally from her former position as Warden at Fountain, saw Lee in the RHU on March 15, 2022, and said that he "needed to be transferred away from Fountain immediately because [he] had beat them previously in a lawsuit" (doc. 121-1, ¶ 63-64).

---

[9] Inmates in the RHU cannot go to the commissary.  Instead, runners make purchases for them (doc. 121-1, ¶ 57-59).

[10] Lee states that the "last statement was a reference to the fact that previously I won a judgment against the FCC administration" (doc. 121-1, ¶ 62).

Lee alleges that he was transferred that day, and while enroute from Fountain to Kilby Correctional Facility, the driver received a text message that Lee's custody level was changed from minimum security to medium security.  Lee states: "this was the first time [he] learned of [his] increase in custody level" and that he "never received a reclassification hearing" (doc. 121-1, ¶ 66-69).

Regarding Lee's reclassification, Angie Baggett, Classification Director, ADOC, stated as follows:

> On February 23, 2022, and pursuant to policy, inmate Lee was served advanced notification that he would be reviewed for reclassification and custody increase due to his behavior while assigned to Fountain Annex. Inmate Lee informed correctional staff that he would escape if transferred anywhere down South. As inmate Lee was in Minimum Out custody which allowed for community-based placement, possible escape risk would warrant review for a more restrictive facility placement. Inmate Lee is noted as refusing to sign the I 2 Hour Advance Notification of Pending Reclassification form. On February 25, 2022, a review for reclassification was conducted which resulted in a recommendation for custody increase to Medium due to Lee's own indication of his escape risk. Inmate Lee refused to sign this document as well. On March 15, 2022, the recommendation for custody increase to Medium was approved by the Central Classification Division, which is required for reclassification. None of the named defendants in this lawsuit had the ability to reclassify Lee either individually or collectively as a group. The approving Classification Review Board Analyst noted that inmate Lee's behavior was not conducive to minimum custody placement.
>
> Inmate Lee's reclassification in March of 2022 was in accordance with the ADOC Male Classification Manual and was necessary for public safety as inmate Lee himself reported his plans to escape from minimum custody placement.

(Doc. 110-7).

The 12 Hour Advance Notification of Pending Reclassification form indicates that Lee "refused to sign" before a serving officer and a witness. (doc. 110-7, p. 6).  The Advance Notification states that Lee would "meet a reclassification team to be considered for change in

custody …" and also set out the reasons for the reclassification. (Id.) The Due Process Hearing Minutes indicate that Lee appeared before Hearing Officer Sandra Hinds, with Candace Nelson, Classification Specialist, presenting evidence for the State of Alabama.  The Minutes indicate that "both sides had an opportunity to ask questions. No questions asked" and that Lee "refused to sign 2/25/22) (doc. 110-7, p. 5).   The Minutes also indicate that the decision was to "Recommend up to Medium Custody at an appropriate institution" (Id.).

     F. <u>Lee's placement in medium security classification facilities</u>

Lee stated that since leaving the Fountain Annex, a minimum-security facility, he observed "fights every day and regularly observe bloody assaults", witnessed "at least two murders in the past two years", and observed "rampant drug use" (doc. 121-1, p. 9).  He stated that the "constant overdoses and violence have adversely affected [his] mental health" (Id.).

Lee testified that before he was placed in medium security facilities, he "didn't have to worry about sleeping with a knife every night" or worry whether he would be attacked (doc. 121-2, p. 21-22).  Since his placement in medium security facilities, he has observed a stabbing, worries about being stabbed or having to stab another inmate "and getting further disciplinaries and be trapped in prison" (Id., p. 24).  He testified that when he was placed at a maximum-security facility, an inmate was murdered within two days of his arrival, and three inmates were murdered (Id.).  He was ultimately transferred to Elmore Correctional Facility, and then to Staton Correctional Facility, both at medium security level.

     III. <u>Standard of review</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see Garczynski v. Bradshaw</u>, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary

judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis omitted). But "'[s]peculation does not create a *genuine* issue of fact.'" Cooper v. Lister, No. 23-11261, 2024 WL 3738739, at *2 (11th Cir. Aug. 9, 2024) (quoting Cordoba v. Dillard's Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (emphasis in original) (citation omitted)). "To avoid summary judgment, the nonmoving party 'must show more than the existence of a "metaphysical doubt" regarding the material facts.'" Cooper, 2024 WL 3738739, at *2 (quoting Ireland v. Prummell, 53 F.4th 1274 (11th Cir. 2022) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Defendants, as the parties seeking summary judgment, bear "the initial responsibility of informing the district court of the basis for [their] motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If Lee, the nonmoving party, fails to make "a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," Defendants are entitled to summary judgment. Celotex, 477 U.S. at 323. In assessing whether Lee has met his burden, "the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter .... Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992); Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013) (citation omitted) (the district courts are "required

to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant."). However, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

IV. Analysis

A. Count I – Eighth Amendment Failure to Protect

Lee brings Count I against McClain and McNeal alleging they were deliberately indifferent to the substantial risk of serious harm that "Lee faced from assailants in the Gangsta Disciple dormitory." (doc. 90, p. 13).  The Court previously found that Lee had "produced evidence in response to" the converted motion for summary judgment "that creates a genuine issue of material fact as to whether Defendants McClain and McNeal failed to protect Lee in violation of the Eighth Amendment" and denied the motion (doc. 67, p. 8-11)).  Lee has produced the same evidence in response to McClain and McNeal's pending motion for summary judgment.  However, this time, McClain and McNeal argue that they are entitled to qualified immunity because "Lee has failed to allege any facts supported by material evidence that would establish a constitutional violation" (doc. 109, p. 7).  They point out that

> Lee does not allege that he notified any defendant that he was in fear of any specific inmate or that Lee himself was aware that he would be assaulted after he was placed in the I-Dorm. When he arrived at the I-Dorm, Lee did not know anybody in the I-Dorm and no one in the I-Dorm recognized or knew Lee. [doc. 110-2,] at pp. 32 and 49). Likewise, Lee did not know who attacked him in the I-Dorm on the third morning he was there. Id. at 64-72. Lee stated that rovers[11]

---

[11] Lee testified that "they have rovers" who are officers, "preventing you from getting into any other dorms. The officers stand in the hallway "in front of the other dorms" (doc. 110-2, p. 12). Lee testified that "restricted movement" was necessary because of robbery and violence, and during the three days he was in I-Dorm, "you go straight to where you're going, right back" (Id.).

prevented inmates from going into other unassigned dorms during the three days he was in the I-dorm. Id. at 56-57. Because rovers prevented inmates from other dorms to enter I-Dorm, the attackers must have been assigned to I-Dorm; Lee did not recognize them, and they did not recognize him. The fact that the assailants were saying that he owed money and the fact that he did not owe anyone money tends to show that the attack was a mistake. (Id. at p. 71). Lee's concern was that he had enemies related to the Pooh Man and Prichard and White attacks, but that was not the case. These attackers were unknown to Lee, and therefore, unknown to McClain or McNeal. Prior to transferring Lee to the main facility, Captain McNeal reviewed Lee's file and noted that none of Lee's validated enemies were present in the main facility, and the inmates that were responsible for the 2016 incident were transferred to other facilities. ([doc. 110-5]). Finally, Lee does not allege that the Defendants were present at the time of the alleged attack to intervene or somehow prevent the attack. ([doc. 110-2] at p. 83).

(Doc. 109, p. 10) (bracketed text added).

Lee argues that "Defendants do not assert that the law was unclear for qualified immunity purposes, they only argue that [Lee] has not established a constitutional violation." (doc. 121, p. 3).[12] Lee argues that he again has presented sufficient evidence[13] that he communicated a substantial risk of assault to McClain and McNeal and that his report of credible threats establishes the requisite subjective awareness of a substantial risk of serious injury.

Lee also argues that McLain and McNeal's "awareness of a substantial risk of harm from [Lee's] complaints is buttressed by their awareness of the general conditions of violence in the main general population dorms at Fountain" (doc. 121, p. 9).  He argues that a "generalized risk of attack can support the conclusion that defendants were deliberately indifferent where serious inmate-on-inmate violence was so pervasive that it was the norm." (Id.).

_____

[12] Lee also argues that McClain and McNeal are effectively filing a "belated motion for reconsideration" and cannot meet the high standard for reconsideration (doc. 121, p. 4-5).

[13] Lee cites to the exhibits submitted with his response to the motion for summary judgment. Specifically, 1. Plaintiff's Declaration (dated August 2, 2024) 2. Plaintiff's Deposition Excerpts 3. Defendant McClain's Deposition Excerpts 4. Defendant Butler's Deposition Excerpts 5. ADOC Inmate Handbook (Ex. 7 to Defendant Butler's deposition) 6. ADOC I dorm Incident Reports 7. Besselaar Complaint. (doc. 121, p. 3, footnote 1)

Lee relies upon Butler's policy of placing inmates in dormitories based on their gang affiliation which resulted in gang-controlled dorms, danger to non-affiliated inmates who are forced to sleep in the hallways, risk of danger so strong that corrections officers won't enter the gang-controlled dorms to assist inmates, the number of assault that occurred at Fountain in 2021 and 2022, and the possibility that other events have not been disclosed  (Id., p. 5-13).

Section 1983 provides a private cause of action against any person who, "under color of" state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  Qualified immunity shields state officials from liability for civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known*."* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Pearson v. Callahan, 555 U.S. 223, 231 (2009).

To invoke qualified immunity, McLain and McNeal must first prove that they were acting within their discretionary authority when the alleged misconduct occurred. Richmond v. Badia, 47 F.4th 1172, 1179 (11th Cir. 2022).  "The term 'discretionary authority' covers 'all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority.'" Hinson v. Bias, 927 F.3d 1103, 1116 (11th Cir. 2019) (citing Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted)). McLain and McNeal satisfy this requirement because all their challenged conduct occurred while acting in their capacity as Warden and Captain at Fountain.

The burden shifts to Lee to demonstrate that qualified immunity is not appropriate. First, Lee must show that his "allegations, taken as true, must establish that the defendant violated a constitutional right" and "[s]econd, the violated right must have been 'clearly established' when it was violated." McCarley v. Dunn, No. 4:21-CV-570-LSC, 2024 WL 993884, at *6 (N.D. Ala. Mar. 7, 2024).  "[T]his two-pronged analysis may be done in whatever order is deemed most appropriate for the case." Id. (quoting Brown v. City of Huntsville, Ala., 608 F.3d 724, 733 (11th

Cir. 2010) citing <u>Pearson v. Callahan</u>, 555 U.S. 223, 129, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001), <u>overruled in part on other grounds by Pearson</u>, 555 U.S. at 236.  "Rights may be clearly established for qualified immunity purposes by one of three methods: (1) 'case law with indistinguishable facts clearly establishing the constitutional right,' (2) 'a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right,' or (3) 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" <u>Crocker v. Beatty</u>, 886 F.3d 1132, 1137 (11th Cir. 2018) (per curiam) (internal quotation marks omitted) (quoting <u>Lewis v. City of W. Palm Beach</u>, 561 F.3d 1288, 1291-92 (11th Cir. 2009)). In the Eleventh Circuit, "only Supreme Court cases, Eleventh Circuit caselaw, and [state] Supreme Court caselaw can 'clearly establish' law." <u>Thomas ex rel. Thomas v. Roberts</u>, 323 F.3d 950, 955 (11th Cir. 2003).

> At summary judgment, even when considering whether a right is clearly established, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." <u>Tolan v. Cotton</u>, 572 U.S. 650, 656 (2014) (per curiam). Rather, courts must "construe the evidence in favor of the plaintiff and decide whether the defendant is entitled to qualified immunity under the plaintiff's version of the facts. <u>Singletary v. Vargas</u>, 804 F.3d 1174, 1180 (11th Cir. 2015). This means that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." <u>Id</u>. (citing <u>McCullough v. Antolini</u>, 559 F.3d 1201, 1202 (11th Cir. 2009)). Nevertheless, courts must "view the facts from the plaintiff's perspective because the determinative issue ... is 'not which facts the parties might be able to prove' but rather whether 'certain given facts' demonstrate a violation of clearly established law." <u>Id</u>. (quoting <u>Crenshaw v. Lister</u>, 556 F.3d 1283, 1289 (11th Cir. 2009) (per curiam)).

<u>Pope v. Dozier</u>, No. 2:20-CV-01399-RDP, 2023 WL 3956157, at *5–7 (N.D. Ala. June 12, 2023), <u>appeal dismissed sub nom. Pope v. Robinson</u>, No. 23-12266-F, 2023 WL 9111241 (11th

Cir. Aug. 8, 2023), and reconsideration denied, No. 2:20-CV-01399-RDP, 2023 WL 6131449 (N.D. Ala. Sept. 19, 2023), and appeal dismissed sub nom. Pope v. Robinson, No. 23-12266, 2024 WL 3326018 (11th Cir. July 8, 2024).

The parties do not dispute that the right to be free from cruel and unusual punishment, as provided in the Eighth Amendment, is clearly established, and that McClain and McNeal violated that right if they were aware of a substantial risk of serious injury, knew how to reduce the risk, by means available to them, but did not do so.  See McCarley v. Dunn, No. 4:21-CV-570-LSC, 2024 WL 993884, at *13 (N.D. Ala. Mar. 7, 2024) ("At the time of this alleged misconduct, it was clearly established that a prison official violates the Eighth Amendment if he is aware of a substantial risk of serious injury, he knows how to reduce that risk by "means available to him," and yet he does nothing.") (citations omitted); Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 620 (11th Cir. 2007) ("We have said that a prison official violates the Eighth Amendment if he responds to a known risk 'in an objectively unreasonable manner.' An official responds to a known risk in an objectively unreasonable manner if 'he knew of ways to reduce the harm but knowingly declined to act' or if 'he knew of ways to reduce the harm but recklessly declined to act.'") (citations omitted). "This 'broad[ ], clearly established principle'" gives ""fair warning that their alleged conduct was unconstitutional.'" McCarley, 2024 WL 993884, at *13 (citations omitted).

Construing the evidence in favor of Lee and viewing the facts from his perspective, which the Court must do at the summary judgment stage, Lee has demonstrated a violation of clearly established law. In sum, Lee's evidence is sufficient for a jury to find that McClain and McNeal were on notice that there was a substantial risk of serious harm to Lee if put in general population.

Lee points out he reported the initial incident involving inmate Red, an associate of his former assailants, and was placed in the RHU and then transferred to the M-Dorm in the Annex doc. 121, p. 5-9).  He also filed grievances on April 10, 2021 and April 11, 2021 explaining that

he received threats from "guys over there that are associated with Bobby White and Pritchett [who] stabbed me last time" and discussed with McClain the incident with Red and threats from inmates in general population who were also associated with his former assailants White and Pritchett (relayed via inmates assigned to the Annex who went to the trade school at the main facility) (Id.). Lee also states that McClain agreed that Lee would have problems in general population and submitted affidavits from two inmates who heard McClain assure Lee that he would not go to general population if he returned to the main facility (Id.)  On January 25, 2022, Lee begged McNeal, and tried to ask McClain, not to place him in general population because of the threats and danger, and he tried to explain to McNeal that even without verified enemies present, Lee saw prisoners associated with his former assailants and received threats conveyed via other inmates assigned to the Annex (doc. 121, p. 5-9).

The evidence is also sufficient for a jury to find that McClain and McNeal responded to Lee's request in an objectively unreasonable manner. They could have placed Lee in the RHU instead of general population or transferred him to another facility. Defendants argue that "[p]rior to transferring Lee to the main facility, Captain McNeal reviewed Lee's file and noted that none of Lee's validated enemies were present in the main facility, and the inmates that were responsible for the 2016 incident were transferred to other facilities" (doc. 109, p. 10). Defendants cite McNeal's recount of his January 25, 2022 conversation with Lee at the health unit (doc. 110-5).  However, McNeal also stated that "Inmate Lee did state that he had enemies down the hallway due to a recent incident that occurred a long time ago." (Id.). Also, after the attack on January 27, 2022. Lee was placed in the RHU for his protection. Accordingly, McClain and McNeal's motion for summary judgment based on qualified immunity is denied.[14]

---

[14]  McClain and McNeal also argue that "there is an overwhelming lack of evidence that the attack ever occurred" (doc. 109, p. 12).  They rely upon the absence of an incident report, Lee's alleged answers to the nurse's questions after the attack, and the body chart whereon the examiner wrote "no visible injuries." (Id.) They also point out that Lee did not mention the attack in his pro se original complaint or in his pro se motion to amend complaint (Id.) (docs. 1, 2). However, Lee testified at deposition and filed a declaration in support of his claim that he was

B. <u>Retaliation in violation of the First Amendment</u>

Previously, the Court granted summary judgment in favor of McClain and McNeal on Lee's allegation that his placement in general population and the RHU after the attack on January 27, 2022 until March 15, 2022, was motivated by his filing of lawsuits against the ADOC (doc. 67).  However, Lee was allowed to amend his complaint. In his third amended complaint he re-alleged retaliation in violation of the First Amendment against McClain, McNeal, Butler, Stewart, and Finch (doc. 90).

Defendants argue that Lee has failed to show that they were subjectively motivated to discipline Lee or had the authority to discipline him in retaliation for filing lawsuits against Alabama Department of Corrections officials (doc. 109, p. 12-13).  They also argue that they do not have authority to reclassify inmates or assign inmates to a specific institution. They argue that Lee was reclassified by the Central Review Board, transferred at the request of Michael Huffman, Classification Supervisor at Fountain, and his transfer was approved by the Classification Unit.

In response, Lee clarifies his First Amendment claim as follows:

Defendants are liable for retaliating against Plaintiff for the following actions:

(1) Defendants Butler and McClain kept Plaintiff in solitary confinement from January 27, 2022 until March 15, 2022 after Plaintiff filed his pro se lawsuit in order to interfere with Plaintiff's ability to file complaints and litigate his pro se lawsuit; (2) Defendant Stewart ordered Plaintiff's custody level to be increased after she ordered his transfer away from Fountain; and (3) Defendant Finch filed an unfounded grievance against Plaintiff alleging Plaintiff stated he was going to escape.[15]

(Doc. 121, p. 13).

---

attacked. At this stage, the Court views the evidence and facts in the light most favorable to Lee and finds that there is sufficient evidence for a reasonable jury to find that an attack occurred on January 27, 2022.

[15] Lee notes that he is bringing this claim only against Sgt. Finch (doc. 121, p. 13, n.5).

Pursuant to the First Amendment, a prison official may not retaliate against an inmate for exercising the right of free speech. Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003). And retaliation by prison officials against an inmate for filing lawsuits can violate the inmate's First Amendment rights. See Wright v. Newsome, 795 F.2d 964 (11th Cir. 1986); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997). "To state a retaliation claim cognizable under § 1983, a prisoner must demonstrate that (i) he engaged in a constitutionally protected activity, (ii) he suffered adverse treatment simultaneously with or subsequent to such activity, and (iii) a causal connection existed between the protected activity and the adverse action." McConico v. Cook, No. CV 1:20-00314-TFM-N, 2022 WL 4113131, at *12 (S.D. Ala. Aug. 15, 2022), report and recommendation adopted, No. 1:20-CV-314-TFM-N, 2022 WL 4110159 (S.D. Ala. Sept. 8, 2022) (citations omitted). "An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by a preponderance of the evidence, which once established raises a presumption that prison officials retaliated against the inmate.... Merely alleging the ultimate fact of retaliation, however, is insufficient.... Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to demonstration of a retaliation claim...." Id.

    1) Defendants Butler and McClain

 Lee clarifies that Butler and McClain kept him in solitary confinement from January 27, 2022 until March 15, 2022 after he filed his *pro se* lawsuit in order to interfere with his ability to file complaints and litigate his *pro se* lawsuit (doc. 121, p. 13). Lee relies upon two statements allegedly made by Butler and McClain.

Specifically, Lee states that a "few days after I filed my February 5, 2022, Complaint, Warden Reosha Butler called me into her office. She referred to my recently filed pro se complaint and told me I had 'gone about it the wrong way.'" (doc. 121-1, ¶ 51).[16]  Butler also

---

[16] The meaning of "it" is not clear.  In context, "it" appears to mean obtaining a transfer away from Fountain (doc. 121-1, ¶

told him that "'I'm where I am supposed to be' referring to a one-man cell, because 'maybe this will teach me to stop filing and writing against the ADOC administration everywhere I go if I sit back there in a one-man cell for a year'" (doc. 121-1, ¶ 52). Lee states that on March 10, 2022, when other prisoners were transferred from the RHU, he asked why he was not transferred.  Lee alleges that McClain told him, "If I keep you back here, you can't litigate your suit you alleged you've filed against me and in a year you will have learned your lesson and by then the courts will dismiss and the FCC administration will be 1-1" (doc. 121-1, ¶ 61).[17] Five days later, on March 15, 2022, Lee was moved to Kilby Correctional Facility (doc. 110-3).

The parties do not dispute that Lee's right to file a lawsuit is protected activity under the First Amendment.  Defendants argue that Lee cannot establish the last element – a causal connection between the retaliatory action and the adverse effect on speech (doc. 109, p. 12). They argue that to establish a causal connection, Lee must show that they were subjectively motivated to discipline Lee because he filed lawsuits against the ADOC. Defendants argue that "[t]here is no evidence, and Lee has not offered any evidence that would show" they were motivated to discipline Lee "or had the ability to carry out the disciplinary action" (Id.).  They also argue that they had no authority to reclassify Lee or assign him to another facility (Id., p. 13). Butler and McClain do not dispute their ability to move Lee within the Fountain complex.

Lee argues that his sworn declaration that Butler and McClain both told him that they placed him in the RHU to stop his litigation (doc. 121-1, ¶¶ 52, 61) is evidence of their subjective motivation and establishes a causal connection between the retaliatory action – placing him in the RHU and the "adverse effect on speech" – preventing him from litigating his

---

[17] Lee states that the "last statement was a reference to the fact that previously I won a judgment against the FCC administration" (doc. 121-1, ¶ 62).

cases against the ADOC (doc. 121).  Butler and McClain did not reply to Lee's argument. For purposes of this summary judgment, the Court must assume the veracity of Lee's declaration.

As to Butler and McClain's retaliatory conduct, i.e., adverse treatment, Lee argues that they kept him in solitary confinement for two months after he filed his *pro se* lawsuit to interfere with his ability to file complaints and litigate his *pro se* lawsuit (doc. 121, p. 13).  But review of the docket indicates that Lee was not prevented from litigating his action. His complaint was docketed February 4, 2022 (doc. 1), an amended complaint was docketed February 22, 2022 (doc. 2), an amended complaint was February 25, 2022 (doc. 3), an amended complaint with request for preliminary injunction was docketed February 25, 2022 doc. 5), a letter to the Clerk explaining that his family will pay the filing and asking the Clerk to "please get the magistrate to serve this complaint asap" was docketed February 25, 2022 (doc. 4), and on March 14, 2022, the day before he was moved to Kilby, an emergency motion to show cause was docketed (preliminary injunction) (doc. 11).

Also, between February 25 and March 14, 2022, the Court ordered Lee to complete and file a motion to proceed without prepayment of fees (doc. 6, issued March 9, 2022), and the Court directed the Clerk to serve the defendants with the complaint and request for preliminary injunction, and set a deadline for their response (doc. 7, issued March 10, 2022). Requests for waiver of service were mailed to Defendants on March 10, 2022 (doc. 8) and the return of service was docketed on March 11, 2022 (doc. 9).  Lee was transferred on March 15, 2022. Thus, Lee is unable to show that his time in RHU interfered with his ability to litigate.  However, because the Court must assume the veracity of Lee's evidence, there remains an issue of fact as to whether he was placed in RHU in retaliation for filing this lawsuit.  Accordingly, Butler and

McClain's motion for summary judgment as to Lee's claim of retaliation under the First Amendment is DENIED.

2) Defendant Stewart

As to Stewart, Lee claims that Stewart ordered his custody level to be increased after she ordered his transfer away from Fountain. Lee argues that Stewart "expressed retaliatory motive when she told Plaintiff that he needed to be transferred because of his litigation, and that same day, March 15, 2022, he was transferred, and his custody level was raised to medium security" (doc. 121, p. 21). Lee argues that the temporal proximity between Stewart's statement to Lee and his transfer on March 15, 2022, and "the raise in his custody level allows a reasonable inference that Defendant Stewart ordered [Lee's] custody level raised so that he would be transferred to a medium security prison" (Id.).  As further evidence of a retaliatory motive, Lee summarily states that he did not receive a reclassification hearing or receive notice of his reclassification. He argues that this sort of deviation from established procedure indicates a retaliatory motive. (doc. 121, p. 21).

First, Stewart presents unrefuted evidence that while she could request a transfer, she was not able to cause Lee to be transferred. Stewart points out that Lee was transferred at the request of Michael Huffman, Classification Supervisor at Fountain, and his transfer was approved by the Classification Unit (doc. 109, p. 13) (doc. 110-10, Email from Huffman to the ADOC). Moreover, it was Lee's request to be transferred, so the undersigned does not understand how the transfer itself was adverse.

As to the claim that Stewart ordered Lee's custody level changed and did so without a hearing, Lee's evidence is insufficient to support the claim.  As previously stated, Angie Baggett, Classification Director, ADOC, stated as follows:

> On February 23, 2022, and pursuant to policy, inmate Lee was served advanced notification that he would be reviewed for reclassification and custody increase due to his behavior while assigned to Fountain Annex. Inmate Lee informed

correctional staff that he would escape if transferred anywhere down South. As inmate Lee was in Minimum Out custody which allowed for community-based placement, possible escape risk would warrant review for a more restrictive facility placement. Inmate Lee is noted as refusing to sign the I 2 Hour Advance Notification of Pending Reclassification form. On February 25, 2022, a review for reclassification was conducted which resulted in a recommendation for custody increase to Medium due to Lee's own indication of his escape risk. Inmate Lee refused to sign this document as well. On March 15, 2022, the recommendation for custody increase to Medium was approved by the Central Classification Division, which is required for reclassification. None of the named defendants in this lawsuit had the ability to reclassify Lee either individually or collectively as a group. The approving Classification Review Board Analyst noted that inmate Lee's behavior was not conducive to minimum custody placement.

Inmate Lee's reclassification in March of 2022 was in accordance with the ADOC Male Classification Manual and was necessary for public safety as inmate Lee himself reported his plans to escape from minimum custody placement.

(Doc. 110-7, p. 4).  Lee has failed to refute this evidence.

The 12 Hour Advance Notification of Pending Reclassification form indicates that Lee "refused to sign" before a serving officer and a witness. (doc. 110-7, p. 6).  The Advance Notification states that Lee would "meet a reclassification team to be considered for change in custody …" and also set out the reasons for the reclassification. Specifically, that Lee was considered for a change in custody because:

Inmate Lee displayed negative behavior while assigned to a Level 2 facility (Fountain Annex (M-Dorm) in Min-Out custody.  On 1/25/22, disciplinary action was initiated against inmate Lee for a violation of Rule # 510 "Conspiracy to commit a violation of rule(s),". Inmate Lee told Sergeant Finch if he was transferred anywhere down south, that he was going to escape.  Inmate Lee was found 'Not Guilty' due to procedural violations, and the 'Not Guilty' decision was approved by Warden McClain on 02/23/2022.  Based on this negative behavior displayed to a Level 2 facility in Min-Out custody, a custody increase up to Medium at an appropriate institution is recommended.

(Doc. 110-7, p. 6).

26

The Due Process Hearing Minutes indicate that Lee appeared before Hearing Officer Sandra Hinds, with Candace Nelson, Classification Specialist, presenting evidence for the State of Alabama.  The Minutes indicate that "both sides had an opportunity to ask questions. No questions asked" and that Lee "refused to sign 2/25/22) (doc. 110-7, p. 5).  The Minutes also indicate that the decision was to "Recommend up to Medium Custody at an appropriate institution" (Id.).

Where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).  Lee's allegations that Stewart re-classified him without notice or a hearing are contradicted by the record.  As are his allegations that Stewart had the authority to reclassify, and that she did so in retaliation for his litigation against Fountain officials. Baggett's affidavit explains that Lee was reclassified based on his alleged statement that he would escape if he were transferred to Loxley, i.e., down south. Accordingly, Stewart's motion for summary judgment as to Lee's First Amendment claim is granted.

3) Defendant Finch

Lee alleges that on January 25, 2022, the day he was transferred from the Annex to the main facility, Lee told McNeal "he intended to sue both him and Warden McClain for violating his constitutional rights by failing to protect him" (doc. 90, p. 8). Lee alleges that on the same day, Sgt. Finch filed a disciplinary charge against Lee on grounds that Lee stated he would escape if he were transferred to Loxley (Id.).  Lee surmises that Sgt. Finch did so at the "behest" of McNeal or McClain and in retaliation for his statement that he intended to sue them (Id.).

27

In support of his position that Sgt. Finch acted in retaliation for filing lawsuits against the ADOC, and that the disciplinary charge was a pretext, Lee argues that if "Finch had really believed that he was an escape risk he would not have immediately sent him to general population" but instead to a secure housing unit. He also points out that the disciplinary charge was dismissed as void on due process grounds. (doc. 121, p. 22).

The evidence of the timing of the events of January 25, 2022, does not support Lee's argument. After Lee was placed in the Annex in March 2021, Lee consistently asked for a transfer to another facility.  The transfer was scheduled to occur on January 25, 2022.  But then Lee resisted the transfer to a work release camp.  Lee states that "on January 25, 2022, Sgt. Finch told me to pack things and that I was being transported to a different facility, Lockley. I had a verbal altercation with Sgt. Finch and said I did not want to be transported there because it was further from my mother and other family." (doc. 121-1, ¶19).  Lee stated that he "expressed [his] frustration with Sgt. Finch" but "never said [he] would attempt to escape" (doc. 121-1, ¶ 22). As a result, the Incident Report was generated, and Lee was taken to the main facility.

<u>After</u>, the above occurred, when Lee was in the health unit at the main facility for an examination before placement, Lee told McNeal that if he "was assaulted in general population, [he] intended to sue both him and Warden McClain for violating [his] constitutional rights by failing to protect" him (doc. 121-1, ¶ 29).

Lee alleges that Finch wrote the disciplinary charge "at the behest of" McClain or McNeal, or on his own, in retaliation for Lee's threat to file a lawsuit against McClain and McNeal (doc. 90, p. 8, ¶ 36).[18]  But according to Lee's own timeline, he did not threaten McNeal

---

[18] "Upon information and belief, Defendant [Finch] wrote the disciplinary violation either at the behest of Defendants McClain and McNeal or, alternatively, on his accord.  These defendants possess retaliatory animus against Plaintiff Lee for threatening to file a lawsuit against them." (doc. 90, p. 8, ¶ 36).

with litigation until <u>after</u> Sgt. Finch had written his disciplinary report.  In other words, the evidence indicates that Sgt. Finch could not have written the disciplinary report in retaliation for Lee's threat to sue because he had not yet made that threat. This holds true without regard to whether Lee did or did not say that he would escape if he were transferred.  The issue raised by Lee is retaliation not the validity of the actual charge.  That the charge was dismissed for procedural grounds has no bearing on whether it was made in retaliation for Lee's alleged threat. Viewing the factual allegations and evidence in the light most favorable to Lee, there is no genuine dispute of fact for a jury to resolve regarding Lee's allegation that the disciplinary charge was made in retaliation for his threat to sue McNeal and McClain. Accordingly, summary judgment is granted in favor of Sgt. Finch.

### C.  Intentional infliction of emotional distress

Lee brings Count III against Regional Director Stewart only (doc. 121, p. 22, n. 10). He alleges that Stewart "intentionally inflicted emotional distress on Plaintiff Lee when [she] raised his custody level status, prevented him from being placed in a work-release camp and instead placed him in a medium security facility" where he is exposed to violent conduct, drug overdoses, and fire and smoke hazards (doc 90, p. 16-17).

Stewart argues that "none of the Defendants" are liable for Lee's reclassification and that they could not have transferred Lee to a different facility (doc. 109, p. 13).[19]  Therefore, they could not have intentionally inflicted emotional distress on Lee by transferring him to a medium security facility (doc. 109, p. 13).

---

[19]  Defendants also argue that they cannot be liable for intentional infliction of emotional distress based on Lee's placement in segregation or his time in the RHU before he was transferred (doc. 109, p. 13).  Although Lee incorporates by reference ¶¶ 26-59 into Count III, he specifically alleges that the emotional distress was inflicted after his custody level was raised on March 15, 2022, during transport, and he was placed in a medium security facility (doc. 90, ¶ 78).

In response, Lee argues that he heard Stewart say that Lee "needed to be transferred immediately because of his litigation." (doc. 121, p. 23).   In Lee's declaration, he states that Stewart saw him in the RHU on March 15, 2022, and "said [he] needed to be transferred away from Fountain immediately because [he] had beat them previously in a lawsuit." (doc. 121-1, ¶¶ 63-64). He believes her statement suggests "that she was involved in the transfer and raised his custody level so he would be sent to a medium security prison." (doc. 121, p. 23).   Lee argues that the "close temporal proximity (the same day) of Stewart's statements to [Lee] and the raise in his custody level allows a reasonable inference that Defendant Stewart ordered [Lee's] custody level raised so that he would be transferred to a medium security prison instead of to a minimum custody work release center." (doc. 121, p. 21).

Under Alabama law, to establish the tort of outrage, Lee must prove that Stewart's conduct: "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." Harrelson v. R.J., 882 So. 2d 317, 322 (Ala. 2003) (quoting Thomas v. BSE Industrial Contractors, Inc., 624 So. 2d 1041, 1043 (Ala. 1993)).

The Alabama Supreme Court has explained that

"by extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement, supra at 72."

Little v. Robinson, 72 So. 3d 1168, 1172 (Ala. 2011) (quoting American Road Service Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1980)).   Consequently, the "tort of outrage is an extremely limited cause of action," Id. (citation omitted).   "[T]he Alabama Supreme Court has previously recognized the tort of outrage in predominantly three circumstances:

The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, Whitt v. Hulsey, 519 So.2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, National Sec. Fire & Cas. Co. v. Bowen, 447 So.2d 133 (Ala. 1983); and (3) egregious sexual harassment, Busby v. Truswal Sys. Corp., 551 So.2d 322 (Ala. 1989). *See also Michael L. Roberts and Gregory S. Cusimano*, Alabama Tort Law, § 23.0 (2d ed. 1996)."

Williams v. Dunn, No. 421CV00921-MHH-HNJ, 2022 WL 21827901, at *43 (N.D. Ala. July 29, 2022) (quoting Wilson v. Univ. of Alabama Health Servs. Found., P.C., 266 So. 3d 674, 676 (Ala. 2017)).  "The Alabama Supreme Court maintains the tort may proceed in other circumstances, and indeed it cites another such circumstance in which 'a family physician[,] ... when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for ... sex for a number of years, resulting in the boy's drug addiction.' "  Williams, 2022 WL 21827901, at *43 (quoting Wilson, 266 So. 3d at 676 (quoting Little, 72 So. 3d 1172-1173)).

Assuming only for purpose of this motion for summary judgment, that Stewart did say that Lee should be immediately transferred because he had prevailed in earlier litigation against Fountain, the evidence is unrefuted that she did not reclassify Lee (doc. 110-7, Baggett Affidavit).[20]  And if she had been the person or entity that reclassified Lee such that he was placed in a medium security facility, the Court declines to extend the tort of intentional infliction of emotional distress to the conduct before the Court.  Stewart's conduct would not be so

---

[20]  On February 23, 2022, Lee was served with an advance notification that he would be reviewed for reclassification and custody because he "informed correctional staff that he would escape if transferred anywhere down South. As inmate Lee was in Minimum-Out custody which allowed for community-based placement, possible escape risk would warrant review for a more restrictive facility placement." (doc. 110-7, p. 1).  "On March 15, 2022, the recommendation for custody increase to Medium was approved by the Central Classification Division, which is required for reclassification." (Id.).

"extreme in degree as to go beyond all possible bounds of decency and … atrocious and utterly intolerable in a civilized society." <u>Wilson</u>, 266 So. 3d at 676-677.  The motion for summary judgment as to Lee's claim for intentional infliction of emotional distress is granted in favor of Defendant Stewart.

      V. <u>Conclusion</u>

      For the reasons set forth herein, Defendants McClain and McNeal's motion for summary judgment based on qualified immunity as to Lee's claim for violation of the Eighth Amendment is denied; Defendants' motion for summary judgment as to Lee's claim for violation of the First Amendment is denied as to McClain and McNeal, but granted as to Stewart and Finch, and Defendant Stewart's motion for summary judgment as to Lee's state law claim for intentional infliction of emotional distress is granted.

      **DONE** and **ORDERED** this 23rd day of August 2024.

         s/ Kristi K. DuBose
        KRISTI K. DuBOSE
        UNITED STATES DISTRICT JUDGE